**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MARIE GRAVES,<br><br>                              Plaintiff,<br><br>v.<br><br>DJO, LLC,<br><br>                              Defendant. | Case No.: 20-CV-1103 W (KSC)<br><br>**ORDER GRANTING REQEUSTS FOR JUDICIAL NOTICE [DOC.S 8-1, 9-1] AND DENYING MOTION TO DISMISS OR STAY [DOC. 4]** |

Pending before the Court is Defendant DJO, LLC's motion to dismiss or, in the alternative, stay this case pending resolution of a Texas state-court litigation. Along with DJO's reply, it has filed an unopposed request for judicial notice. Plaintiff Marie Graves opposes the motion and has also filed an unopposed request for judicial notice.

The Court decides the matter on the papers submitted and without oral argument. See Civ. L.R. 7.1(d)(1). For the reasons stated below, the Court **GRANTS** the requests for judicial notice [Docs. 8-1, 9-1] and **DENIES** the motion to dismiss or stay this matter [Doc. 4].

## I. BACKGROUND

### A. Graves' Employment with DJO.

According to the Complaint, Plaintiff Marie Graves worked for Defendant DJO, LLC from April 30, 2018 until June 1, 2019 as a Global Medical Device Auditor in its Vista, California headquarters. (*Compl.* [Doc. 1] ¶ 17.) On July 11, 2018, DJO claimed that it would be relocating its headquarters to Dallas, Texas. (*Id.* ¶ 18.)

On October 2, 2018, Graves received a letter from DJO confirming that her position in Vista would be terminated on June 1, 2019. (*Compl.* ¶¶ 20, 21.) The letter stated that Graves would be offered a separation package that would include "severance, health insurance, outplacement assistance, and a completion bonus of $33,000, 'which will be paid, less applicable withholdings, on your last day of employment along with your final pay check'. The completion bonus was contingent on Ms. Graves 'remain[ing] in good standing and perform[ing] your duties in a satisfactory manner through the Separation date.'" (*Id.* ¶ 21.) The letter did not state that as a condition for payment, Graves would also have to agree to a general release of all claims. (*Id.*)

In January 2019, Graves informed DJO that she was pregnant and requested paperwork for FMLA coverage. (*Compl.* ¶ 28.) Before notifying DJO about her pregnancy, she had been in discussions with the company's Vice President of Regulatory Affairs, Ehab Esmail, about the possibility of continuing to work for the company from Vista, California as a Manger/Lead of Regulatory Affairs. (*Id.* ¶¶ 22–25.) Just prior to announcing her pregnancy, Graves was asked by Esmail to formalize their discussions about the position. (*Id.*)

On March 13, 2019, Esmail held a meeting and explained there was an opening in Carlsbad for the "lead" in Regulatory Affairs, which was posted online. (*Compl.* ¶ 30.) Graves immediately emailed DJO's in-house recruiter and Esmail about the position because Esmail previously implied the position would be hers. (*Id.*) "Esmail called Ms. Graves and stated that the position is actually temporary, that he was not going to hire or

1 | even consider Ms. Graves for the position, and that he would be giving the job to Usman
2 | Khan, M[r]. Esmail's friend." (*Id.*)

On March 26, 2019, Graves checked the website and discovered the position was still open. (*Compl.* ¶ 31.) She then emailed Esmail and Colleen Farrell of Human Resources to verify if the position remained open. (*Id.*) A few weeks later, Graves received an updated organizational chart indicating the Manager of Regulatory Affairs position was still open and it was still listed on the website. (*Id.* ¶ 32.) Graves again sent Esmail an email about the position. (*Id.*) He stated the person who was going to fill the role was out of the country caring for his sick wife, was expected to start later that week but that if he did not, Esmail would explore other options. (*Id.*)

On April 19, 2019, Graves sent an extensive email to Esmail, Farrell, and DJO's new Director of RA, Pete Gonzalez, requesting an explanation as to why her application was not considered for the position given that it had now been posted for over 45 days. (*Compl.* ¶ 33.) Graves did not receive a response. (*Id.*)

On April 26, 2019, Graves learned that all full-time employees and contractors in the RA department, except Graves, were granted an extension of their positions up to June 29, 2019. (*Compl.* ¶ 34.) When Graves asked Esmail for an explanation, she received an incoherent response that contractors were not extended. (*Id.*) Graves was a full-time employee, not a contractor. (*Id.*) At some point, "[a]ll contractors and employees in Ms. Graves' department had their last date of employment extended until February 2020." (*Id.*) Graves' employment was still terminated on June 1, 2019. (*Id.* ¶ 1.)

On May 8, 2019, Graves began maternity leave, but DJO still required her to continue to work from home. (*Compl.* ¶ 35.) She believed the following provision in the October 2, 2018 letter regarding her separation severance agreement would be voided if she did not continue to work while on maternity leave:

> if you . . . fail to continue to report to work . . . and/or satisfactorily perform the duties of your employment, you will be deemed to have resigned your

position and forfeited continued employment, pay, benefits and severance eligibility.

(*Id.*)  Therefore, from May 8, 2019 until May 16, 2019, Graves worked about 36 hours assisting another employee, Jim Pomeroy, despite being on FMLA leave and without being compensated by DJO.  (*Id.* ¶ 36.)

On May 16, 2019, Pomeroy informed Graves that Esmail was no longer with the company.  (*Compl.* ¶ 37.)  He also told Graves that although he was not sure what opportunities would be available with the company in the future, he told her to "reach out to him when 'you're done with having a baby.'"  (*Id.*)

On May 31, 2019, the day before her employment was to terminate, Graves received an agreement titled, Confidential Separation Agreement and General Release of all Claims (the "Release").  (*Compl.* ¶ 39.)  "On June 10, 2019, Ms. Graves received a call telling her that the agreement would lapse if not signed by June 10, 2019."  (*Id.*)  Graves, therefore, signed the agreement so that she could receive her $33,000 bonus as promised in the October 2, 2018 letter.  (*Id.*)

"On June 11, 2019, Graves learned that her medical coverage was going to terminate on June 30, 2019, which was contrary to what she had been told would happen regarding the severance."  (*Compl.* ¶ 40.)  DJO also failed to pay the first severance installment on June 21, 2019.  (*Id.* ¶ 41.)  Despite DJO's promise to "fix the confusion with the medical insurance," on July 8, 2019 she received notice that her insurance terminated on June 30, 2019.  (*Id.* ¶ 42.)

**B.   <u>DJO Files Suit in Texas After Receiving a Draft Complaint from Graves' Attorney.</u>**

On March 24, 2020, Graves' attorney sent a letter and draft copy of the Complaint to DJO's attorney indicating she intended to file a lawsuit.  (*Dolghih Decl.* [Doc. 5-1] ¶ 3.)  On May 1, 2020, DJO filed a complaint for declaratory relief against Graves in

Denton County, Texas. (*Id.* ¶ 4.[1]) On February 23, 2021, the lawsuit was dismissed for lack of personal jurisdiction over Graves. (*Jt. Status Rpt.* [Doc. 11] 2:8–12.) DJO plans to appeal the decision. (*Id.* 2:27–28.)

Meanwhile, on June 17, 2010, Graves filed this lawsuit. (*See Compl.*) The Complaint asserts 13 causes of action for violation of a number of provisions of the California Labor Code and California Government Code, violation of 29 USC 2601 *et seq.* (the "FMLA"), intentional infliction of emotional distress, wrongful termination in violation of public policy, and unfair competition under California Business and Professions Code §§ 17200 *et seq.*

DJO now seeks to dismiss the lawsuit arguing that it is barred by the Release Graves signed in June 2019. Alternatively, DJO requests a stay of this matter pending final resolution of the Texas litigation.

## II.  LEGAL STANDARD

The court must dismiss a cause of action for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint. See Parks Sch. of Bus., Inc. v. Symington, 51 F.3d 1480, 1484 (9th Cir. 1995). A complaint may be dismissed as a matter of law either for lack of a cognizable legal theory or for insufficient facts under a cognizable theory. Balisteri v. Pacifica Police Dep't., 901 F.2d 696, 699 (9th Cir. 1990). In ruling on the motion, a court must "accept all material allegations of fact as true and construe the complaint in a light most favorable to the non-moving party." Vasquez v. L.A. Cnty., 487 F.3d 1246, 1249 (9th Cir. 2007). But a court is not required to accept legal conclusions couched as facts, unwarranted deductions, or unreasonable inferences. Papasan v. Allain,

---

[1] According to Elisaveta Dolghih's declaration, a copy of the complaint filed in Texas state court is attached to her declaration as Exhibit A. (*Amend. Dolghih Decl.* ¶ 4.) However, Exhibit A is the Complaint filed by Graves in this case. (*See id.* Ex. A.]

478 U.S. 265, 286 (1986); Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001).

Complaints must contain "a short plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court has interpreted this rule to mean that "[f]actual allegations must be enough to rise above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 554, 555 (2007). The allegations in the complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 570).

### III. DISCUSSION

DJO argues that Graves' lawsuit is barred by the Release. (*Amend. P&A* [Doc. 5-1] 5:15–16, 13:6–14:21.)  Alternatively, DJO argues the case should be stayed pending the outcome of the Texas state-court action. (*Id.* 5:18–21, 14:22–18:6.)  Graves does not appear to dispute that the terms of the Release would bar this lawsuit.  Instead, she argues the Release is unconscionable and unenforceable. (*Opp'n* [Doc. 8] 4:27–5:4.)  She also opposes the stay, pointing out that the Texas case has been dismissed. (*Id.* 9:18–22.)

For the reasons that follow, the Court finds the Complaint's allegations suggest the Release is unconscionable and therefore unenforceable.  Additionally, given the trial court's dismissal of the Texas action, a stay is not warranted.

### C. **The Complaint adequately pleads facts suggesting the Release is unconscionable and thus unenforceable.**

California Civil Code § 1670.5(a) provides that "[i]f the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result."  Unconscionability has a

"procedural" and "substantive" element. <u>A&M Produce Co. v. FMC Corp.</u>, 135 Cal.App.3d 473, 486 (1982). The procedural element focuses on "oppression" and "surprise." <u>Id.</u> "'Oppression' arises from an inequality of bargaining power which results in no real negotiation and 'an absence of meaningful choice.' [Citation omitted.] 'Surprise' involves the extent to which the supposedly agreed-upon terms of the bargain are hidden in a prolix printed form drafted by the party seeking to enforce the disputed terms. [Citation omitted.]" <u>Id.</u>

The substantive element looks at "the effects of the contractual terms and whether they are unreasonable. Because a contract is largely an allocation of risks, a contractual provision is 'substantively suspect if it reallocates the risks ... in an objectively unreasonable or unexpected manner.' [Citation omitted.]" <u>Marin Storage & Trucking, Inc. v. Bencoj Contracting and Eng'g, Inc.</u>, 89 Cal.App.4th 1042, 1052–53 (2001). Thus, for example, a one-sided arbitration agreement requiring one contracting party, but not the other, to arbitrate all claims would be considered overly harsh. <u>Tiri v. Lucky Chances, Inc.</u>, 226 Cal.App.4th 231, 246–47 (2014); <u>Little v. Auto Striegler, Inc.</u>, 29 Cal.4t 1064, 1071 (2003) ("Substantively unconscionable terms may take various forms, but may generally be described as unfairly one-sided.")

In order to find a contract unenforceable because it is unconscionable, both procedural and substantive elements must be present. <u>Armendariz v. Foundation health Psychcare Services, Inc.</u>, 24 Cal.4th 83, 114 (2000). "But they need not be present in the same degree. 'Essentially a sliding scale is invoked which disregards the regularity of the procedural process of the contract formation, that creates the terms, in proportion to the greater harshness or unreasonableness of the substantive terms themselves.' [Citations omitted.] In other words, the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." <u>Id.</u>

Here, Graves alleges that based on the terms of October 2, 2018 letter, her severance package—which included health insurance and a $33,000 completion bonus—

was to be paid if Graves "remain[ed] in good standing and perform[ed] your duties in a satisfactory manner through the Separation date.'" (*Compl.* ¶ 21.)  Seven months later, while Graves was on maternity leave and literally on the eve of being unemployed because of DJO's alleged relocation, she received the agreement containing the Release from DJO.  (*Id.* ¶¶ 21, 35, 39.)  Although her employment terminated the next day, DJO did not pay her the $33,000 completion bonus promised in October 2018 letter.  Then on June 10, she received a phone call stating that if she did not sign the agreement by that day, it would lapse.  (*Id.* ¶ 39.)  Graves, therefore, signed the agreement to ensure she received the previously promised $33,000 bonus.  (*Id.*)

      Graves' factual allegations support the inference of a fairly significant level of procedural unconscionability.  When read in favor of Graves, as is required in evaluating a motion to dismiss, it is reasonable to infer from the factual allegations that DJO unilaterally changed the terms of the separation severance agreement on the eve of Graves' termination, after she had arguably already satisfied the terms included in the October 2018 letter, by requiring her to execute the Release in order to received the $33,000 bonus and continued medical insurance.

      DJO nevertheless asserts that Graves was not "ambushed" by the agreement because she knew about DJO's relocation to Texas as early as July 2018.  (*Reply* [Doc. 9] 6:24–27.)  But DJO confuses the issue, which is not when Graves learned about DJO's relocation or even when she requested the severance package.  Rather, the issue is when did DJO notify Graves that her severance package was contingent on executing the Release.  Based on the facts alleged in the Complaint, it is reasonable to infer that the Release was a last-minute condition, unilaterally imposed by DJO eight months after it first proposed the severance package and on the eve of Graves' last day of employment, while still at home on maternity leave with a newborn baby.  In short, the facts support a finding of both the "oppression" and "surprise" elements of procedural unconscionability.

      The allegations also support a finding that the Release was substantively unconscionable because it solely applied to Graves' claims against DJO:

> In consideration of and in return for the promises and covenants undertaken in this Agreement … Employee … does hereby release, absolve and discharge the Company and each of the Company's parents, subsidiaries, related companies and business concerns, past and present, and each of them, as well as each of their partners, trustees, directors, officers, agents, attorneys, servants and employees, past and present, and each of them (collectively referred to as "Releasees") from any and all claims, demands, … and liabilities of whatever kind or nature in state or federal law, equity or otherwise, whether known or unknown to Employee (collectively, the "Claims"), which Employee now owns or holds or has at any time owned or held as against Releasees….

(*Amended P&A* 6:14–7:6, citing *Dolghih Decl.* Ex. A.[2])  In fact, DJO's motion does not even attempt to assert the Release was mutual and instead focuses on the consideration Graves received for the Release.  (*See Amend. P&A* 8:23–8:16.)  Because the factual allegations strongly suggest DJO changed the terms of the bargain at the last minute by imposing a unilateral release of all claims, DJO's arguments are unpersuasive at this stage in the litigation.

### D. A stay is not warranted at this time.

DJO requests a stay pending resolution of the Texas litigation.  However, as acknowledged by the parties' joint status report, the trial court has dismissed the case based on a lack of personal jurisdiction over Graves.  (*Jt. Status Rpt.* 2:8–12.)  The finding seems well supported by the fact that Graves is a California resident, who was employed by DJO in California and the Release was executed in California.  Regardless, DJO's assertion that it *plans* to appeal indicates that as of the filing of the status report, there was no pending litigation.  (*Id.* 2:27–28.)  For these reasons, a stay is not warranted at this time.

---

[2] The Amended P&A references Exhibit A of the Dolghih Decl. for the Release.  However, as stated above, Exhibit A is Graves' Complaint in this case.  The Release is attached to DJO's Request for Judicial Notice [Doc. 9-1] as Exhibit 2.

### IV. CONCLUSION & ORDER

For the foregoing reasons, the Court **GRANTS** the requests for judicial notice [Docs. 8-1, 9-1] and **DENIES** DJO's motion to dismiss [Doc. 4] and the request to stay without prejudice.

**IT IS SO ORDERED**.

Dated:  March 12, 2021

Hon. Thomas J. Whelan
United States District Judge